**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADSPORT, INC., on behalf of itself and all others similarly situated, | CASE NO. 18-cv-8456 |
| Plaintiff, | <u>JURY TRIAL DEMANDED</u> |
| v. | |
| OPKO HEALTH, INC., and PHILLIP FROST, | |
| Defendants. | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff by his attorneys, on behalf of itself and all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Opko Health, Inc.'s ("Opko" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, court filings in the action captioned *SEC v. Barry Honig, et al.*, 18-cv-8175 (S.D.N.Y. filed Sept. 7, 2018) (the "SEC Action"), and publicly available trading data relating to the price and volume of Opko common stock.

## I.    **INTRODUCTION**

1.     This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC by plaintiff on behalf of all persons or entities who purchased the publicly traded common stock of Opko between September 26, 2013 and

September 7, 2018, inclusive (the "Class Period") to recover damages caused to the Class by defendants' violations of the securities laws.

2.      Opko purports to be a diversified healthcare company.  According to Opko's website, Opko operates a diagnostics business, which includes Bio-Reference Laboratories, a pharmaceutical business, a biologics business, and has "production and distribution assets worldwide, multiple strategic investments and an active business development strategy."

3.      Throughout the Class Period, Opko's SEC filings represented that part of its growth strategy stemmed from pursuing "complementary, accretive, or strategic acquisitions and investments" and that the Company has and may continue to "make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder."  Opko further represented that its management team, including its CEO and Chairman, Defendant Phillip Frost ("Frost"), "has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth."

4.      Further, due to Defendant Frost's significant ownership of Opko common stock, he had the ability to "significantly impact" Opko's "approval of mergers and other significant transactions."  Individually, and through Frost Gamma Investment Trusts, of which Defendant Frost is the sole trustee, and The Frost Group, LLC, Defendant Frost controlled approximately 35% of Opko's common stock.  Moreover, during the Class Period, Opko's SEC filings represented that Defendant Frost was essential to the

Company's business and that it was "dependent to a significant degree upon the efforts" Frost.

5.     In truth, during the Class Period, Opko and Defendant Frost acquired interests in certain companies as part of an illegal "pump-and-dump" scheme in concert with other alleged fraudsters.

6.     On September 7, 2018, investors began to learn the truth about Opko's investments in certain early-stage companies when the SEC issued a Litigation Release titled "SEC charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Scheme" and disclosed the filing of the SEC Action against Defendants and others for perpetrating an illegal "pump-and-dump" scheme between 2013 and 2018.  The SEC alleged that Defendants were members of a group who "manipulated the share price of the stock of three companies in classic pump-and-dump schemes." Defendant Frost allegedly participated in two of these three schemes (involving Biozone Pharmaceutical, Inc. ("Biozone") (n/k/a Cocrystal Pharma, Inc. ("Cocrystal")), and MabVax Therapuetics Holdings, Inc. ("MabVax")).

7.     In the SEC Action, the SEC is represented by its New York Regional Office.

8.     On this news, Opko shares declined $1.01 per share from a closing price on September 6, 2018 of $5.59 per share, to trade at $4.58 per share, a decline of approximately 18% on heavier than usual volume, when trading in Opko shares was halted.

9.     At or around 2:34 p.m. on September 7, 2018, trading in Opko was halted at $4.58 per share by Nasdaq.  Nasdaq issued a press release over *Globenewswire* that

announced "that trading was halted today in OPKO Health, Inc. (OPK) at 14:34:38 Eastern Time for 'additional information requested' from the company at a last sale price of \$4.5835.   Trading will remain halted until OPKO Health, Inc. has fully satisfied Nasdaq's request for additional information."

10.     On September 10, 2018, *Barron's* published an article titled "SEC Charges Against Phillip Frost Might Just Be the Tip of the Iceberg" that stated, in part, the following:

> The U.S. Securities and Exchange Commission filed stock fraud charges late last week against billionaire drug entrepreneur Phillip Frost and a group of associates, accusing them of making \$27 million in pump-and-dump stock schemes. The civil suit filed in Manhattan's federal district court alleges that Frost and nine others manipulated micro-cap stocks over the last five years, aided and abetted by Frost's investment trust and a Miami-based drug development company where he is board chairman and chief executive, Opko Health. . . .
>
> The stock fell 17% Friday before trading was halted, and trading remained halted Monday afternoon with shares at \$4.58.   The SEC complaint alleges that Frost participated in three stock manipulation schemes led by Barry Honig, a 47-year old investor in Boca Raton, Fla., whose penny-stock collaborations with the billionaire Frost were examined by Barron's in 2014. Honig was "the primary strategist" of the three schemes, according to the complaint, which gained control of three tiny public companies — not named in the complaint — and then paid promoters to write favorable and misleading articles on the Seeking Alpha website. Honig then allegedly arranged manipulative trades — including some by Honig's charitable foundation and Frost's investment trust — to get the stocks to a level where the schemers could dump them on the public, according to the SEC complaint.

11.     On September 13, 2018, *The Motley Fool* published an article titled "The SEC Takes Aim at Opko Health's Phillip Frost" that stated, in part, the following:

> On Sept. 7, the Nasdaq halted trading in in Opko Health (NASDAQ: OPK) after the Securities and Exchange Commission (SEC) levied market manipulation charges against it and its billionaire CEO, Phillip Frost. The stock has remained halted ever since and that's increasing concern that

4

Opko Health investors will suffer significant losses. Is this news as bad as it seems? . . .

**A big blow**

Frost has been considered one of the savviest healthcare entrepreneurs on the planet. While serving as head of dermatology for Mount Sinai Medical Center in Miami in the early 1970s, he acquired nearly bankrupt Key Pharmaceuticals in 1972. Over the next 14 years, he helped transform Key Pharmaceuticals into a major asthma treatment player that was acquired for nearly $800 million by Schering-Plough in 1986.

In 1987, Frost followed up that success by combining three small-cap healthcare companies to form Ivax Corporation, a company he turned into a major generic drugmaker. Teva Pharmaceutical (NYSE: TEVA) acquired Ivax for roughly $7.5 billion in 2006. Frost was appointed Teva's vice chairman following the deal, and in 2010 he became Teva's chairman.

Despite his responsibilities at Teva, Frost remained an active dealmaker. He took ownership stakes in various small-cap companies, and after he left Teva in 2015, he became Opko Health's CEO. At Opko, he's acquired several companies to build up the company's drug pipeline and expand it into new markets. For instance, Opko's acquisition of Cytochroma landed Rayaldee, a vitamin D prohormone that won FDA approval in 2016, and its acquisition of BioReference Labs in 2015 gave it about $1 billion in specialty lab services revenue. Opko Health has also amassed equity stakes in various companies, including Arno Therapeutics, Cocrystal Pharma, and RXi Pharmaceuticals. Overall, Opko discloses ownership in 12 small-cap companies in its 2017 10-K SEC filing that are collectively valued at $40.6 million as of Dec. 31.

Unfortunately, based on the SEC's complaint, it appears Frost's wheeling-and-dealing style may have landed him and Opko Health in hot water that significantly tarnishes his and his company's reputation.

**What now?**

Up until now, the fact that Frost has been involved so heavily in Opko Health as CEO and is its largest shareholder has helped support the company's share price. Given the black eye associated with the SEC charges against him, investors are unlikely to pay a Frost-premium to own Opko Health shares from here.

If that's the case, then Opko Health is going to need some big wins. Unfortunately, Opko Health's acquisitions haven't panned out so far. It's

been slow going for Rayaldee, and BioReference Labs' revenue is declining. Also, a chemotherapy-induced nausea and vomiting drug, Varubi, that it licensed to Tesaro (NASDAQ: TSRO) and that won FDA approval in 2015 has been a commercial dud. Earlier this year, Tesaro walked away from Varubi after it had to pull an IV formulation off the market following reports of anaphylaxis. Overall, Opko reported a $6.2 million net loss on $263.7 million in sales, down 10% year over year, in Q2.

The lackluster financial performance does little to offset the overhang now associated with the SEC's "continuing investigation." The situation is likely to be a major distraction for the company, and the possibility of lawsuits adds even more uncertainty.

12.     On September 14, 2018, trading in Opko shares resumed, and Opko shares further declined.  At the close of trading on September 14, 2018, Opko shares declined from $4.58 per share at the time Nasdaq halted trading on September 7, 2018, to close at $3.90 per share, a decline of $0.68 per share, or approximately 15% on heavier than usual volume.

13.     Between the close of trading on September 6, 2018 and the close of trading September 14, 2018, Opko shares declined from $5.59 per share to close at $3.90 per share, a decline of $1.69 per share, or approximately 30%, on heavier than usual volume.

## II.     JURISDICTION AND VENUE

14.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act.  Venue is proper pursuant to Section 27 of Exchange Act because Defendants conduct business in this District.

### III.   THE PARTIES

**A. Plaintiff**

15.     Plaintiff purchased Opko publicly traded common stock as detailed in the attached Certification and was damaged thereby.

**B. Defendants**

16.     Defendant Opko is incorporated in Delaware and its principal executive offices are located at 4400 Biscayne Boulevard, Miami, FL 33137.

17.     Defendant Frost was the Company's Chief Executive Officer and Chair of the Company's board of directors at all relevant times. Frost, individually and through affiliated entities he controls (The Frost Group, LLC and Frost Gamma Investments Trust), Defendant Frost controls approximately 35% of Opko's common stock. Opko's common stock trades on the Nasdaq in this District under the symbol "OPK."

18.     Because of Defendant Frost's position with the Company and substantial ownership of Opko common stock, he possessed the power and authority to control the contents of Opko's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendant Frost was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and he had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to him, but not to the public, Defendant Frost knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## IV.    CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons or entities who purchased the publicly traded common stock of Opko during the period from September 26, 2013 and September 7, 2018, inclusive (the "Class").

20.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the U.S.  As of August 1, 2018, Opko had over 559 million shares of common stock outstanding, which were actively traded on the Nasdaq in an efficient market.  As of February 20, 2018, Opko reported approximately 620 holders of record of its common stock.

21.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

## V. DEFENDANTS FROST AND OPKO PARTICIPATED IN PUMP AND DUMP SCHEMES IN VIOLATION OF THE FEDERAL SECURITIES LAWS

24.     The SEC Action alleges Defendants Opko and Frost, and others perpetrated "pump-and-dump" schemes from 2013 through 2018 involving the shares of Biozone/Cocrystal, MabVax and MGT.  Biozone is headquartered in Atlanta, Georgia. MGT is headquartered in Harrison, New York (which is in this District) and traded on the NYSE from 2007 until October 2016.  MabVax is headquartered in San Diego, California.

25.     According to the SEC, a group of microcap fraudsters led by Barry Honig ("Honig") manipulated the share price of the stock of Biozone/Cocrystal, MabVax and MGT in classic pump-and-dump schemes. Defendant Frost allegedly participated in two of these three schemes (involving Biozone/Cocrystal and MabVax). Honig allegedly orchestrated the acquisition of large quantities Biozone/Cocrystal, MGT and MabVax

shares at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates, including Defendant Frost, then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors, including sales of Biozone shares by Defendant Frost for proceeds of approximately $1.1 million.

26.     The SEC Action alleges both Opko and Defendant Frost violated the federal securities laws, including allegations that Defendant Frost violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

27.     The Class Period begins on September 26, 2013, when an article was published on *Seeking Alpha* titled "Opko and its Billionaire CEO Invested in Biozone" that promoted shares of Biozone by highlighting Defendants' 25% position in Biozone. The author, John H. Ford ("Ford"), who was purportedly independent, wrote:

> I recently established a position in BioZone Pharmaceuticals (BZNE.OB) based on the company's undervaluation, its patented QuSomes technology, and the fact that Opko . . . and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.) BioZone's strong patent portfolio, multibillion-dollar addressable markets, and current revenue stream, make it an ideal asymmetrical trade, with large upside potential, and limited downside risk.

28.     Unknown to investors, as alleged in the SEC Action, Ford was paid by Honig for his favorable article with 180,000 Biozone shares at the below market price of $0.40 per share.  According to the SEC Action, the market reacted strongly to the

10

Biozone promotion: the trading volume of Biozone rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013, and the price of Biozone shares increased approximately 58% over the same period. The SEC Action alleges that on October 1-4, 2013, Defendant Frost sold 1,987,991 artificially inflated Biozone shares for proceeds of approximately $1.1 million.

29.     On March 3, 2014, Defendant Frost caused the Company to file its annual report for the year ended December 31, 2013 with the SEC on Form 10-K ("2013 10-K"). The 2013 10-K, which was signed by Defendant Frost, represented:

**GROWTH STRATEGY**

We expect our future growth to come from . . . opportunistically pursuing complementary, accretive, or strategic acquisitions and investments. . . .

We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .

• *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

* * *

In February 2012, we purchased from Biozone Pharmaceuticals, Inc., a publicly-traded company engaged in the manufacture and sale of pharmaceutical and cosmetic products ("BZNE"), $1.7 million of 10% secured convertible promissory notes (the "BZNE Notes"), convertible into BZNE common stock at a price equal to $0.20 per common share, which BZNE Notes are due and payable on February 24, 2014 and ten year warrants (the "Warrants") to purchase 8.5 million shares of BZNE common stock at an exercise price of $0.40 per share. On January 3, 2014, BZNE finalized its planned merger with Cocrystal Discovery, Inc. ("Cocrystal"), a privately-held biopharmaceutical company in which we made an investment in September 2009 (refer below and to Note 12 for

details regarding our investment in Cocrystal). In January 2014, we invested an additional $.5 million in the combined Biozone-Cocrystal entity pursuant to which we acquired 1 million shares of Biozone's common stock and 1 million warrants to acquire additional Biozone common stock. As of December 31, 2013, we owned an approximately 16% equity position in BZNE. . . .

30.     The 2013 10-K further represented the following concerning Defendant Frost (the "Key Man Risk Disclosure"):

**_Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D._**

Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business. The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations. Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments. If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.

31.     On May 9, 2014, Defendant Frost caused the Company to file its quarterly report for the quarter ended March 31, 2014 with the SEC on Form 10-Q ("2014 Q1 10-Q"). The 2014 Q1 10-Q represented "[w]e previously made investments in [Biozone] . . . and [Cocrystal]" and represented that Opko's ownership interest in Cocrystal was a 16% stake valued at $5.5 million.

32.     On August 11, 2014, Defendant Frost caused the Company to file its quarterly report for the quarter ended June 30, 2014 with the SEC on Form 10-Q

("2014 Q2 10-Q").   The 2014 Q2 10-Q repeated the representations concerning Biozone that were made in the 2014 Q1 10-Q.

33.     On November 7, 2014, Defendant Frost caused the Company to file its quarterly report for the quarter ended September 30, 2014 with the SEC on Form 10-Q ("2014 Q3 10-Q").   The 2014 Q2 10-Q represented that "[w]e previously made investments in [Biozone] . . . [Cocrystal] . . ." and represented Opko's ownership interest in Cocrystal was a 15% stake valued at $5.5 million.

34.     On February 27, 2015, Defendant Frost caused the Company to file its annual report for the year ended December 31, 2014 with the SEC on Form 10-K ("2014 10-K").  The 2014 10-K, which was signed by Defendant Frost, represented:

**GROWTH STRATEGY**

We expect our future growth to come from leveraging our proprietary technology and development strengths, and opportunistically pursuing complementary, accretive, or strategic acquisitions and investments. . . .

We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .

• *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

* * *

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal, another entity in which we have an equity investment, to which Cocrystal was the surviving entity, and the name of the issuer was changed to Cocrystal Pharma, Inc. ("CPI"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the

company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At December 31, 2014, we hold an 8% ownership interest in CPI.

35.     Further, the 2014 10-K repeated the Key Man Risk Disclosure alleged in Paragraph 30.

36.     According to the SEC Action, on April 6, 2015, Defendant Opko, Defendant Frost, through Frost Gamma Investments Trust, and others acquired an interest in MabVax through a Series E private placement that raised $12 million for MabVax.

37.     Then, on April 8, 2015, an article was published on *Seeking Alpha* titled "Opko Spots Another Overlooked Opportunity In MabVax Therapeutics" that stated, in part, the following:

- Opko Health has a strong track record of identifying undervalued companies in which to invest.
- Opko most recently announced a strategic investment in MabVax Therapeutics which appears to present another such investment opportunity.
- MabVax has a pipeline consisting of two Phase II cancer vaccines, a novel antibody discovery platform, an existing relationship with Juno Therapeutics, and an enticing value proposition.

Opko Health (NYSEMKT:OPK) has a history of discerning overlooked assets in which to make strategic investments prior to value creation. Opko shareholders, in turn, get exposure to not only Opko's core assets, but also to a bevy of smaller, high growth healthcare and biotech assets. Opko has proven quite adept at then being able to monetize these investments later in their growth cycle, translating to meaningful value creation for Opko shareholders. Its path from $2 per share when it first went public to its current $14.30 share price is filled with examples of such investments. In this article, I shall take a look at Opko's most recent strategic investment in MabVax Therapeutics (OTCPK:MBVX), a cancer immunotherapy company. MabVax presents a compelling investment opportunity at its current market cap relative to its pipeline.

38. According to the SEC Action, John R. O'Rourke III ("O'Rourke") published the April 8, 2015 article under the pseudonym "Wall Street Advisors" and did not disclose that he wrote the article at the direction of Honig, and that despite his "extensive business relationships" with Honig, Defendant Frost and others, and O'Rourke's involvement in facilitating MabVax's financing, O'Rourke "falsely claimed that 'the author has no business relationship with'" MabVax.

39. According to the SEC Action, the promotion was successful. MabVax's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, and certain of the alleged fraudsters sold MabVax shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

40. On May 11, 2015, Defendant Frost caused the Company to file its quarterly report for the quarter ended March 31, 2015 with the SEC on Form 10-Q ("2015 Q1 10-Q"). The 2015 Q1 10-Q made the following representations concerning Biozone:

**RELATED PARTY TRANSACTIONS** . . . .

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At March 2015, we hold an 8% ownership interest in COCP.

41. On August 5, 2015, Defendant Frost caused the Company to file its quarterly report for the quarter ended June 30, 2015 with the SEC on Form 10-Q

("2015 Q2 10-Q").  The 2015 Q2 10-Q made the following representations concerning

Biozone and MabVax:

### RELATED PARTY TRANSACTIONS

In April 2015, we made a $2.5 million investment in a private placement transaction with MabVax Therapeutics Holdings, Inc. pursuant to which we acquired 33,333 shares of MabVax Series E Convertible Preferred Stock and warrants to purchase 1,666,667 shares of MabVax common stock. Prior to our investment in MabVax, Dr. Frost held shares in MabVax indirectly through an entity in which he has an ownership interest. Dr. Frost, as well as non-affiliated investors, invested in the private placement transaction on the same financial terms. In connection with the OPKO investment, Steven Rubin, our Executive Vice President, Administration, was appointed as an advisor to MabVax, and we have the right to designate two board members. . . .

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10 -year warrants exercisable at $0.50 per share.  At June 30, 2015, we hold an 8% ownership interest in COCP. . . .

42.     On November 9, 2015 Defendant Frost caused the Company to file its

quarterly report for the quarter ended September 30, 2015 with the SEC on Form 10-Q

("2015 Q3 10-Q").  The 2015 Q3 10-Q made the following representations concerning

Biozone and MabVax:

### RELATED PARTY TRANSACTIONS . . . .

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million

shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At September 30, 2015, we hold an 8% ownership interest in COCP. We hold investments in . . . MabVax (0%) . . . . The acquisition of these investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. . . . In October 2015, we made an additional $375 thousand investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock. . . .

43.    On February 29, 2016, Defendant Frost caused the Company to file its

annual report for the year ended December 31, 2015 with the SEC on Form 10-K

("2015 10-K").  The 2015 10-K, which was signed by Defendant Frost, represented:

**GROWTH STRATEGY**

We expect our future growth to come from leveraging our proprietary technology and development strengths, and opportunistically pursuing complementary, accretive, or strategic acquisitions and investments. . . .

We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .

• *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

\* \* \*

**RELATED PARTY TRANSACTIONS** . . . .

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at

$0.50 per share. At December 31, 2015, we hold an 8% ownership interest in COCP. . . .

44.     The 2015 10-K repeated the Key Man Risk Disclosure alleged in Paragraph 30.

45.     On May 9, 2016 Defendant Frost caused the Company to file its quarterly report for the quarter ended March 31, 2016 with the SEC on Form 10-Q ("2016 Q1 10-Q"). The 2016 Q1 10-Q made the following representations concerning Biozone and MabVax:

**RELATED PARTY TRANSACTIONS**

We hold investments in . . . MabVax (1%) . . . COCP (8%) . . . . These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. . . In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock.

46.     On August 8, 2016 Defendant Frost caused the Company to file its quarterly report for the quarter ended June 30, 2016 with the SEC on Form 10-Q ("2016 Q2 10-Q"). The 2016 Q2 10-Q repeated the representations concerning Biozone and MabVax made in the 2016 Q1 10-Q.

47.     On November 7, 2016 Defendant Frost caused the Company to file its quarterly report for the quarter ended September 30, 2016 with the SEC on Form 10-Q ("2016 Q3 10-Q"). The 2016 Q3 10-Q repeated the representations concerning Biozone and MabVax made in the 2016 Q1 10-Q, and further disclosed that "[i]n August 2016 we invested an additional $1.0 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. In September 2016 we invested an additional $2.0 million in COCP for 4,878,050 shares

of its common stock."

48.     On March 1, 2017, Defendant Frost caused the Company to file its annual report for the year ended December 31, 2016 with the SEC on Form 10-K ("2016 10-K"). The 2016 10-K, which was signed by Defendant Frost, represented:

**GROWTH STRATEGY**

We expect our future growth to come from leveraging our proprietary technology and development strengths, and opportunistically pursuing complementary, accretive, or strategic acquisitions and investments. . . .

We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .

• *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

\* \* \*

**Related Party Transactions**

We hold investments in . . . MabVax (4%), COCP (8%) . . . . These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. . . . In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock. . . . In August 2016 we invested an additional $1.0 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. In September 2016, we invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

49.     The 2016 10-K repeated the Key Man Risk Disclosure alleged in Paragraph 30.

50.     On May 10, 2017 Defendant Frost caused the Company to file its quarterly report for the quarter ended March 31, 2017 with the SEC on Form 10-Q ("2017 Q1 10-Q").   The 2017 Q1 10-Q repeated the representations concerning Biozone and MabVax made in the 2016 10-K.

51.     On August 8, 2017 Defendant Frost caused the Company to file its quarterly report for the quarter ended June 30, 2017 with the SEC on Form 10-Q ("2017 21 10-Q").  The 2017 Q2 10-Q repeated the representations concerning Biozone and MabVax made in the 2016 10-K and made the following representations:

> In May 2017, we invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. We had also invested an additional $1.0 million in MabVax in August 2016 for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. In April 2017, we invested an additional $1.0 million in COCP for 4,166,667 shares of its common stock, and in September 2016, we had invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

52.     On November 8, 2017 Defendant Frost caused the Company to file its quarterly report for the quarter ended September 30, 2017 with the SEC on Form 10-Q ("2017 Q3 10-Q").   The 2017 Q3 10-Q repeated the representations concerning Biozone and MabVax made in the 2016 10-K and the 2017 Q2 10-Q, and further represented that in "July 2017, we invested an additional $0.1 million in MabVax for 152,143 shares of common stock . . . ."

53.     On March 1, 2018, Defendant Frost caused the Company to file its annual report for the year ended December 31, 2017 with the SEC on Form 10-K ("2017 10-K").   The 2017 10-K, which was signed by Defendant Frost, repeated the representations concerning Biozone and Mabvax as made in the 2017 Q3 10-Q and made the following representations:

**GROWTH STRATEGY**

We expect our future growth to come from leveraging our proprietary technology and development strengths, and opportunistically pursuing complementary, accretive, or strategic acquisitions and investments. . . .

We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .

• *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

54.     The 2017 10-K repeated the Key Man Risk Disclosure alleged in Paragraph 30.

55.     On May 8, 2018 Defendant Frost caused the Company to file its quarterly report for the quarter ended March 31, 2018 with the SEC on Form 10-Q ("2018 Q1 10-Q"). The 2018 Q1 10-Q repeated the representations concerning Biozone and MabVax made in the 2017 10-K, and further represented that in "February 2018, we invested an additional $1.0 million in COCP for a convertible note, which is convertible into 123,456 shares of its common stock."

56.     On August 7, 2018 Defendant Frost caused the Company to file its quarterly report for the quarter ended June 30, 2018 with the SEC on Form 10-Q ("2018 Q2 10-Q"). The 2018 Q2 10-Q repeated the representations concerning Biozone and MabVax made in the 2017 10-K and 2018 Q1 10-Q.

57.     The statements referenced above in Paragraphs 27-56 were materially false and/or misleading because they misrepresented and failed to disclose that: 1)

Defendants Frost and Opko acquired ownership interest in Biozone and MabVax to advance Defendant Frost's own pecuniary interest at the expense of the Opko shareholders; 2) Defendants, acting in concert with others, were using their ownership interest in Biozone and MabVax to perpetrate an illegal "pump-and-dump" scheme designed to enrich Defendant Frost and other perpetrators of the illegal "pump-and-dump" scheme; and 3) Defendant Frost's conduct exposed the Company to reputational risk that could materially harm the Company's business opportunities and the Company's negotiations with acquisition targets, investment targets, and potential joint venture partners.

## VII.   THE TRUTH BEGINS TO EMERGE

58.     On September 7, 2018, through the SEC Litigation Release and media reports, news of the filing of the SEC Action began to be disclosed.

59.     On this news, Opko shares declined from a closing price on September 6, 2018 of $5.59 per share, to $4.58 per share, a decline of approximately 18% on heavier than usual volume.  At or around 2:34 p.m. on September 7, 2018, trading in Opko was halted at $4.58 per share by Nasdaq.

60.     On September 14, 2018, trading in Opko shares resumed, and Opko shares further declined.  At the close of trading on September 14, 2018, Opko shares declined from $4.58 per share at the time Nasdaq halted trading on September 7, 2018, to close at $3.90 per share, a decline of $0.68 per share, or approximately 15% on heavier than usual volume.

61.     Between the close of trading on September 6, 2018 and the close of trading September 14, 2018, Opko shares declined $1.69 per share, a decline of approximately 30% on heavier than usual volume.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

62.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Opko stock price and operated as a fraud or deceit on Class Period purchasers of Opko's stock by failing to disclose Defendants participation in "pump-and-dump" schemes. Defendants achieved this by making positive statements about Opko's business while they knew that they were engaging in illegal "pump-and-dump" schemes, as alleged herein. Later, however, when Defendants' prior misrepresentations and material omissions were revealed and became apparent to the market, the price of Opko's stock fell precipitously as the prior artificial inflation came out of Opko's stock price. As a result of their purchases of Opko's stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

63.     As a direct result of the public revelations regarding the truth about Defendants' illegal schemes during the Class Period, the price of Opko's stock materially declined.  This drop removed the inflation from Opko's stock price, causing real economic loss to investors who purchased the stock during the Class Period.

64.     The decline in Opko's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Opko's stock price declines

negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## IX.    FRAUD-ON-THE-MARKET DOCTRINE

65.    At all relevant times, the market for Opko's common stock was an efficient market for the following reasons, among others:

(a)    The Company's common stock met the requirements for public listing and was listed and actively traded throughout the Class Period on the Nasdaq, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)    The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

66.    As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Opko from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Opko at artificially inflated prices and a presumption of reliance applies.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

67.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their illegal conduct and their control over Opko's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

68.    Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendant Frost.

69.    Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Frost is the CEO and Chairman of Opko, issued statements and press releases on behalf of Opko, and had the opportunity to commit the fraud alleged herein.

## XI.    NO SAFE HARBOR

70.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in

this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Opko who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
**For Violation of Section 10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

71.     Plaintiff incorporates Paragraphs 1-70 by reference.

72.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Opko publicly traded common stock during the Class Period.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Opko's publicly traded common stock.  Plaintiff and the Class would not have purchased Opko common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

75.     As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Opko common stock during the Class Period.

**<u>SECOND CLAIM FOR RELIEF</u>**
**For Violation of Section 20(a) of the 1934 Act**
**Against Defendant Frost**

76.     Plaintiff incorporates Paragraphs 1-70 by reference.

77.     Defendant Frost acted as a controlling person of Opko within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, substantial ownership of Opko common stock, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public,

Defendant Frost had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Defendant Frost was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, Defendant Frost had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, Opko and Defendant Frost each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his positions as a controlling person, Defendant Frost is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Opko's and Defendant Frost's wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs,

including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

<b><u>JURY DEMAND</u></b>

Plaintiff demands a trial by jury.

Dated: September 17, 2018                    By:   /s/   Jeffrey P. Campisi

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
Email: rkaplan@kaplanfox.com
Email: jcampisi@kaplanfox.com

*Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATION

I, GARY KNUDSON on behalf of ADSPORT, INC., hereby certify as follows:

1.      I have reviewed a complaint prepared against Opko Health, Inc. alleging violations of the securities laws and authorize the filing of the complaint.

2.      I did not purchase the securities that are the subject of this action at the direction of plaintiff s counsel or in order to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary. I fully understand the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning my selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

4.      My transactions in Opko Health, Inc. common stock during the proposed class period, are set forth below:

| DATE | SHARES PURCHASED | SHARES SOLD | PRICE PER SHARE |
|---|---|---|---|
| 2/18/16 | 2,260 | 0 | $8.81 |

5.      I have not sought to serve as a representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct, executed on this 13TH day of September, 2018.


_____
GARY KNUDSON

CEO of Adsport, Inc.